IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLOYD H. NELSON,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>JEANNE WOODFORD; R.H. DENNINGER; W.A. DUNCAN; DAVID TRISTAN; WARDEN JOE McGRATH; N. GRANNIS; M. NIMROD; P.T. SMITH; J.B. WILLIAMS; J.COX; J. BARNENURG; PAUL DILLARD; R. KIRKLAND; B. SAMPLES; D. HEFFLICK; and E. REILLY,<br><br>　　　　　Defendants.　　　　　　　／ | No. C 04-03684 CRB (PR)<br><br>**ORDER**<br><br>(Docs # 22 & 29) |

　　　　Plaintiff, a prisoner at Pelican Bay State Prison ("PBSP") has filed a pro se civil rights complaint under 42 U.S.C. § 1983 against the director and various other officials/employees of the California Department of Corrections ("CDC"), and against the warden and various other officials/employees of PBSP. Plaintiff alleges that defendants have censored non-sexual literary magazines that contain "incidental" frontal nudity, sexually-explicit reading novels and other communications that are not obscene, internet-generated materials, and certain non-English or Spanish language materials that do not contain "coded" messages. He claims that no legitimate penological interest exists for this censorship and "as such the regulations used are overbroad, vague, inappropriately and inconsistently applied, thus violating his First Amendment rights."

1    Per order filed on January 18, 2005, the Court found that plaintiff's allegations of
2 censorship state cognizable claims under section 1983 for violation of the First Amendment,
3 when liberally construed, and ordered the United States Marshal to serve the defendants.
4 The Court denied plaintiff's request for a temporary restraining order ("TRO")/preliminary
5 injunction for failure to satisfy the requirements of Federal Rule of Civil Procedure 65.

6    Defendants now move for summary judgment on the grounds that there are no
7 material facts in dispute and that they are entitled to judgment as a matter of law. They also
8 claim that they are entitled to qualified immunity. Plaintiff has filed an opposition and
9 defendants have filed a reply.

## DISCUSSION

**A.   Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make

2

1 this showing, "the moving party is entitled to judgment as a matter of law." Celotex Corp.,
2 477 U.S. at 323.

**B.     Claims and Analysis**

The allegations in the complaint and the attachments thereto reveal that plaintiff was denied certain publications banned by PBSP policies enacted pursuant to California Code of Regulations title 15, section 3006(c). First, plaintiff was denied the Star Distribution catalog, and the September and October 2003 issues of *Esquire* magazines pursuant to a prison policy banning full frontal nudity. See Watkins Decl. Ex. A, D and E (prohibition of frontal nudity, California Code of Regulations title 15, section 3006(c)(17)). Second, plaintiff was denied *The Best American Erotica* and *The Book* pursuant to a prison policy banning obscenity. See Watkins Decl. Ex. B and F (prohibition of obscenity, California Code of Regulations title 15, section 3006(c)(15)). Lastly, plaintiff was denied *Teach Yourself Swahili* pursuant to a prison policy restricting certain non-English and Spanish communications. See Watkins Decl. Ex. C. (prohibition of publications and correspondence written in the languages of Swahili, Nahuatl, Runic or Celtic, see Def. Ex. G; CDC-0009). Plaintiff claims that the policies banning him from receiving these publications, and their application in the above instances, violate his constitutional rights.

Prisoners retain those First Amendment rights not consistent with their status as prison inmates or with legitimate penological objectives of the corrections system. See Pell v. Procunier, 417 U.S. 817, 822 (1974). Regulations limiting prisoners' access to publications or other information are valid only if they are reasonably related to legitimate penological interests. See Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); Crofton v. Roe, 170 F.3d 957, 959 (9th Cir. 1999). In Turner, the Supreme Court identified four factors to consider when determining whether a regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted

1 constitutional right will have on guards and other inmates and on the allocation of prison
2 resources generally"; and (4) the "absence of ready alternatives", or, in other words, whether
3 the rule at issue is an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90.
4 To defeat summary judgment, plaintiff must demonstrate that the regulations at issue are not
5 reasonably related to legitimate interests, or that there is a genuine issue of material fact
6 regarding the applicability of the regulations to the materials. Bahrampur v. Lampert, 356
7 F.3d 969, 973 (9th Cir. 2004).

### 1. **Star Distribution Catalog and *Esquire* Magazine Claims**

Plaintiff was denied the publications the Star Distribution catalog, and the September and October 2003 issues of *Esquire* magazine because they contained frontal nudity. Plaint. Decl. in opp. at 46-47. Initially plaintiff was also denied the August issue of *Esquire* magazine; however, during the appeals process it was determined that the August 2003 issue did not contain sexually explicit material banned by the prison's policy, and plaintiff ultimately received this magazine. Plaint. Ex. N.

Plaintiff alleges that he was improperly denied the Star Distribution catalog and the September and October 2003 issues of *Esquire*. Watkins Decl. Ex. A, D, and E. He claims that by denying him these publications, defendants violated his First Amendment rights by denying him "non-sexual literary publications that contain 'incidental' frontal nudity." He further claims that defendants improperly applied California Code of Regulations title 15, section 3006(c)(15)(A)-(C), subdivisions (1)-(6), when denying him these publications. Plaint. Decl. at 12. Plaintiff presents both a facial constitutional challenge to section 3006(c)(15), and an as applied challenge to the denial of his publications. However, he cites the regulation pertaining to obscenity, not frontal nudity, when making this claim. Id.

Defendants claim that plaintiff was denied the Star Distribution catalog and the specific issues of *Esquire* magazine not because they were deemed obscene under section 3006(c)(15), but because they contained frontal nudity in contravention of section 3006(c)(17). Def. Ex. A, and D.

4

### a. **Regulation of Frontal Nudity**

California Code of Regulations title 15, section 3006(c)(17) is constitutional. The regulation bans "Sexually explicit images that depict frontal nudity in the form of personal photographs, drawings, magazines or other pictorial format." Cal. Code Regs. tit. 15 § 3006(c)(17)(2006). The regulation defines sexually explicit material as "material that shows the frontal nudity of either gender, including the exposed female breast(s) and/or the genitalia of either gender." Cal. Code Regs. tit. 15 § 3006(c)(17)(A)(2006).

The regulation is reasonably related to legitimate penological interests. The en banc court of the Ninth Circuit found a similar ban on nudity to be constitutional under all four prongs of the Turner analysis set forth above. See Mauro v. Arpaio, 188 F.3d 1054, 1059-63 (9th Cir. 1999) (en banc). Like section 3006(c)(17), the policy at issue in Mauro banned "sexually explicit material," defined as "materials that show frontal nudity" including "personal photographs, drawings, and magazines and pictorials that show frontal nudity." Id. at 1057.

To meet the first Turner factor, the governmental interest underlying a regulation restricting prisoners' First Amendment rights must be legitimate and neutral, and the regulation must be rationally related to that objective. See Thornburgh, 490 U.S. at 414; Mauro, 188 F.3d at 1059. The objectives of section 3006(c)(17), like the objectives of the policy at issue in Mauro, are to "aid in the legitimate penological interests of maintaining the safety and security of the prisons, rehabilitating inmates, reducing sexual harassment of correctional officers and preventing a hostile work environment." See Initial Statement of Reasons for the adoption of California Code of Regulations title 15, section 3006(c)(17) ("Initial Statement of Reasons") Plaint. Ex. G.

A regulation restricting certain publications is "neutral" if prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security. See Thornburgh, 490 U.S. at 415-16; see, e.g., Mauro, 188 F.3d at 1059-60 (ban on "sexually explicit material . . . that show frontal nudity" expressly aimed at maintaining jail security, rehabilitating inmates and reducing sexual harassment of female detention officers

found "neutral" because jail administrators drew distinction between materials solely on the basis of the materials' potential effect on the jail's legitimate objectives). Like the policy at issue in Mauro, section 3006(c)(17) is neutral. Accord Mauro, 188 F.3d at 1060 (holding that "the relationship between the possession of sexually explicit materials and the problems sought to be addressed by [such a] policy – sexual harassment of female officers, jail security and rehabilitation of inmates – is clear.") Like the policy at issue in Mauro, there is a "valid, rational connection between [section 3006(c)(17)] and the legitimate governmental interest put forward to justify it". Turner, 482 U.S. at 89-90.

Section 3006(c)(17) also passes the second prong of the Turner test. Like the policy at issue in Mauro, section 3006(c)(17) does not ban all sexually explicit materials from inmates. See Mauro, 188 F.3d at 1061; (policy "does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females.") Department of Corrections policy applies Section 3006(c)(17)(B) in compliance with Mauro; an administrative bulletin advises prison staff that the ban on sexually explicit materials "does not include sexually explicit letters, articles or photographs of clothed person(s) . . . ." Plaint. Ex. F. Further, section 3006(c)(17)(B) expressly allows certain sexually explicit educational, medical/scientific, and artistic materials. See Cal. Code Regs. tit. 15 § 3006(c)(17)(B)(2006). The regulation provides ample alternative means for prisoners to exercise their First Amendment rights.

Section 3006(c)(17) meets the third prong of the Turner test. As contemplated in Mauro, the impact of allowing inmates unrestricted access to sexually explicit materials would be significant. Mauro, 188 F.3d at 1061. Unrestricted access could lead to the sexual harassment of female officers and violence among inmates stemming from the possession or use of such materials. See id.; see also Plaint. Ex. G (Initial Statement of Reasons).[1]

---

[1] "Sexually explicit materials, within the institutions, have contributed to an increase of verbal assault and have lead to intimidation of female correctional staff when attempting to perform cell searches. Inmates subject female correctional staff to a daily barrage of unwarranted sexual advances...[a]dditionally, unrestricted access to sexually explicit material could lead to bartering between inmates and anatomical comparisons could lead to fights between inmates thereby jeopardizing the safety of prison staff and other inmates." Initial Statement of Reasons, September 30, 2002.

6

Finally, section 3006(c)(17) meets the fourth prong of the Turner test; the regulation is not an exaggerated response to the prison's legitimate concerns. Turner, 482 U.S. at 90-91; Mauro, 188 F.3d at 1062. The burden is on the plaintiff to show an alternative that fully accommodates his rights at de minimis cost to valid penological interests. See Thornburgh, 490 U.S. at 418. Plaintiff proposes the addition of an exception to Section 3006 (c)(17)(B) for "non sexual" literary materials that contain 'incidental' frontal nudity. The fourth Turner factor is not a "least restrictive alternative" test, however. Prison officials are not required to adopt the least restrictive means of achieving their legitimate objectives. See Mauro, 188 F.3d at 1063. The regulation already contains ample alternatives for plaintiff to acquire sexually explicit materials, so his claim that the regulation is an "exaggerated response" must fail.

Because section 3006(c)(17) does not materially differ from the policy upheld in Mauro, the complaint does not state a valid facial constitutional challenge to the regulation.

### b. **Application of Section 3006(c)(17) to the Star Distribution Catalog and *Esquire* Magazines**

The regulation prohibits frontal nudity as defined, including "the exposed female breast." See Cal. Code Regs. tit. 15 § 3006(c)(17)(A)(2006). Plaintiff was denied the Star Distribution Catalog because it contained "pictures of full frontal nudity" as prohibited by section 3006(c)(17). See Def. Ex. A. The September and October 2003 issues of *Esquire* magazine were denied because they contained depictions of exposed female breasts as prohibited by section 3006(c)(17). See Def. Ex. D. There is no factual dispute as to the nudity depicted in the publications. Contrary to plaintiff's conclusory allegation, the materials do not meet the exceptions articulated in section 3006(c)(17)(B)(1)(2).[2] Further,

---

[2] The following sexually explicit material shall be allowed:

1. Departmentally purchased or acquired educational, medical/scientific, or artistic materials, such as books or guides purchased by the department for inclusion in institution libraries and/or educational areas; or

2. Educational, medical/scientific, or artistic materials, including, but not limited to, anatomy medical reference books, general practitioner reference books and/or guides, National Geographic, or artistic

7

1 defendants' bans were directed towards specific publications, as opposed to a category of
2 publications.  After closer scrutiny on appeal, defendants reversed their initial determination
3 and allowed plaintiff the August 2003 issue of *Esquire* magazine.  See Plaint. Ex. N.

4       Regulations that provide for individualized determinations as opposed to
5 predetermined categorical exclusions are likely to pass constitutional muster.  See
6 Thornburgh, 490 U.S. at 416-17; see, e.g., Sherman v. MacDougall, 656 F.2d 527, 528 (9th
7 Cir. 1981) (banning individual issues of American Rifleman magazine constitutional when
8 each issue scrutinized and found to contain detailed information on guns).  Conversely,
9 regulations to be viewed with caution include those which categorically prohibit access to a
10 broad range of materials, see Keenan v. Hall, 83 F.3d, 1083, 1093 (9th Cir. 1996), amended,
11 135 F.3d 1318 (9th Cir. 1998); see, e.g., id. at 1093 (allowing challenge to prison's
12 "publisher's only" rule and prisoners' general lack of access to reading materials to establish
13 whether ban is too broad); Johnson v. Moore, 948 F.2d 517, 520 (9th Cir. 1991) (rule
14 categorically excluding inmates from receiving soft-cover books and magazines not sent
15 directly from publisher must be scrutinized closely); Pratt v. Sumner, 807 F.2d 817, 820 (9th
16 Cir. 1987) (objection on First Amendment grounds to total ban on prisoners' receipt of books
17 from sources other than publishers and bookstores not legally frivolous), or "fairly invite
18 prison officials and employees to apply their own personal prejudices and opinions as
19 standards for [] censorship," Thornburgh, 490 U.S. at 416 n.14 (citation omitted); see, e.g.,
20 Pepperling v. Crist, 678 F.2d 787, 790 (9th Cir. 1982) (prison officials may not capriciously
21 apply blanket regulation prohibiting sexually explicit magazines).

22       Rather than impose a blanket ban on all sexually explicit magazines, or even all issues
23 of *Esquire* magazine, defendants prohibited plaintiff from receiving only those issues of
24 *Esquire* that contained frontal nudity.  Defendants' decision to ban the publications was a
25 constitutional application of section 3006(c)(17).  There remains no genuine issue for trial on

---

27 reference material depicting historical, modern, and/or post modern era art, purchased or possessed by inmates and approved by the institution head or their designee on a case-by-case basis.
28 Cal. Code Regs. tit. 15 § 3006(c)(17)(B)(2006).

8

whether section 3006(c)(17) prohibits the receipt of the September and October 2003 issues of *Esquire* magazine and the Star Distribution catalog because the sexually explicit content contained in the publications fall clearly within the purview of the valid regulation.

### 2. Best American Erotica and The Book Claims

Plaintiff was denied *The Best American Erotica* and *The Book*, pursuant to PBSP policy because they were found to be obscene under California Code of Regulations title 15, section 3006(c)(15). Def. Decl. Ex. B and F. Plaintiff claims that defendants violated his First Amendment rights by denying him "sexually explicit non-obscene reading novels." Plaint. Compl. at 12. Plaintiff presents both a facial constitutional challenge to California Code of Regulations title 15, section 3006(c)(15), and an as applied challenge to the denial of the specific publications. Defendants claim that plaintiff was properly denied *The Best American Erotica* and *The Book* because they contain obscene material prohibited by section 3006(c)(15), a valid regulation.

#### a. Regulation of Obscenity

The challenged regulation prohibiting prisoners' access to obscene materials is constitutional. The relevant portions are as follows:

> Except as authorized by the institution head, inmates shall not possess or have under their control any matter which contains or concerns any of the following:
> . . . .
>
> (15) Obscene material and mail containing information concerning where, how, or from whom obscene material may be obtained.
>
> (A) Obscene material means material taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest; and is material which taken as a whole, depicts or describes sexual conduct; and which, taken as a whole, lacks serious literary, artistic, political, or scientific value.
> . . . .
>
> (C) Material subject to the tests in paragraphs (A) or (B) includes, but is not limited to material that:
>
> (1) Depicts, displays, or describes penetration of the vagina or anus, or contact between the mouth and the genitals.

Cal. Code of Regs. tit. 15, § 3006(c)(15)(2006).

9

Contrary to plaintiff's allegations, the regulation is reasonably related to legitimate penological interests. Section 3006(c)(15) satisfies the first prong of Turner because it facilitates the legitimate and neutral objectives of protecting the safety of staff and inmates, and protecting staff from a hostile work environment encouraged by the dissemination of these kinds of materials. See Plaint. Ex. B. (Initial Statement of Reasons for the adoption of California Code of Regulations title 15, section 3006(c)(15)). The prohibition of obscene materials is intended to further the same legitimate penological objectives that the prohibition of sexually explicit materials is designed to prohibit. Because the legitimacy of these interests were established in Mauro, the first prong of the Turner test is met.

Section 3006(c)(15) also satisfies the second prong of the Turner test. The regulation leaves ample alternative means for prisoners to exercise their First Amendment rights. The provision only prohibits obscene materials, leaving open access to non-obscene, sexually explicit literary materials and letters.

Section 3006(c)(15) meets the third prong of the Turner test; allowing inmates unrestricted access to obscene materials would have a significant impact on prison staff, other inmates and the allocation of prison resources. Turner, 482 U.S. at 89-90; Mauro, 188 F.3d at 1061. Unrestricted access could lead to the sexual harassment of female officers and violence among inmates stemming from the possession or use of such materials. See id.; see also Plaint. Ex. B.

Finally, the fourth Turner factor is met because plaintiff points to no alternative that fully accommodates his First Amendment rights at de minimis cost to valid penological interests. Thornburgh, 490 U.S. at 418. The burden is on plaintiff to show an alternative that fully accommodate his rights at de minimis cost to valid penological interests. See id. Instead plaintiff maintains that the regulation at issue is an "exaggerated response to prison concerns", characterizing the ban as a restriction on sexually explicit "non-obscene" reading novels. The regulation at issue only prohibits obscene materials. Further, the fourth Turner factor is not a "least restrictive alternative" test. Prison officials are not required to adopt the least restrictive means of achieving their legitimate objectives. See Mauro, 188 F.3d at 1063.

10

1 California Code of Regulations title 15 section 3006(c)(15) is a constitutional facially 2 valid regulation because it is reasonably related to the legitimate penological interests of 3 maintaining prison safety and protecting staff from a hostile work environment.

### b. *The Best American Erotica*

*The Best American Erotica* is a collection of short stories edited by Susie Bright. See Def. Ex. B. Some of these stories contain material that defendants found to be "explicitly prurient" in violation of section 3006(c)(15). Id. For example, the book contains an explicit description of oral sex. Id. Section 3006(c)(15)(C)(1) allows for the prohibition of "[depictions], displays, or [descriptions of] penetration of the vagina or anus, or contact between the mouth and the genitals." Prison officials determined that *The Best American Erotica* was obscene, and therefore denied plaintiff the publication. Plaintiff appealed this determination.

Judging obscenity is a subjective determination, and outside the prison context there might be a legitimate First Amendment challenge as to whether *The Best American Erotica* is obscene. However, within the prison context officials are afforded a deferential level of review. Defendants' denial of *The Best American Erotica* was a reasonable application of the valid obscenity regulation, section 3006(c)(15). *The Best American Erotica* contains a graphic description of oral sex, the type of content specifically listed in the obscenity regulation. In the prison context, regulations that apply to specific types of content due to specific inherent risks or harms are considered to be content neutral. Bahrampour, 356 F.3d at 975; (citing Thornburgh, 490 U.S. at 415, 416). Further, the evidence shows that defendants denied *The Best American Erotica* not as part of a blanket ban on obscene materials, but as the result of an individualized determination. See Def. Ex. B.

The June 16, 2003 Warden Level Decision reviewed plaintiff's appeal of the denial of two books that had been prohibited due to obscene content: *Notes of a dirty old man* by Charles Bukowski, and *The Best American Erotica*. Id. At this second level review, defendants concluded that *Notes of a dirty old man* was not obscene despite "crude" language and detailed descriptions of a sexual encounter. Id. Defendants determined that because the

11

1  book did not focus exclusively on sex, that the intent of the book was not "prurient" in
2  nature, and thus not obscene.  Id.  Prisoner was allowed the book *Notes of a dirty old man.*
3  Id.  Defendants determined that in the case of *The Best American Erotica*, that the graphic
4  nature of the book outweighed any literary value, and that the "intent of [the] book is
5  explicitly prurient."  Id.

6  As discussed above, individualized determinations as opposed to predetermined
7  categorical exclusions of publications are likely to pass constitutional muster.  See
8  Thornburgh, 490 U.S. at 416-17.  The denial of *The Best American Erotica* in this case was
9  the result of an individualized determination that left plaintiff with ample access to other
10 "sexually explicit non-obscene reading materials."  It did not violate plaintiff's First
11 Amendment rights.

12       **c.**     ***The Book***

13  Plaintiff was denied *The Book* because it "contains material depicting in graphic
14 detail, penetration of the vagina or anus or contact between the mouth and genitals and
15 includes acts of sexual bondage."  See Def. Ex. F; Feb. 18, 2004, Director's Level Appeal
16 Decision.  *The Book* was legitimately withheld due to its obscene content and not because it
17 was downloaded from the Internet as plaintiff claims.  The permanent injunction issued in
18 Clement v. California Dep't of Corrections, enjoins prison officials from "enforcing any
19 policy prohibiting California inmates from receiving mail *because* it contains Internet-
20 generated information."  364 F.3d 1148, 1151 (9th Cir. 2004) (emphasis added).  Plaintiff's
21 claim that defendants acted in violation of the injunction has no merit.

22  Plaintiff was legitimately denied the publications *The Best American Erotica* and *The
23 Book* due to their obscene contents in accordance with section 3006(c)(15).  Despite
24 plaintiff's conclusory claims to the contrary, there is no triable issue of fact as to whether
25 these materials may be banned under section 3006(c)(15).  The publications were denied to
26 further the legitimate penological interests of maintaining prison safety and protecting staff
27 from a hostile work environment.  Plaintiff's First Amendment rights were not violated.
28

12

### 3. *Teach Yourself Swahili*

On May 8, 2003 Plaintiff was issued a Notice of Disapproval, informing him that he had been denied receipt of a dictionary he had ordered entitled *Teach Yourself Swahili* pursuant to a prison policy banning "[p]ublications and correspondence written in the languages of Swahili, Nahuatl, Runic or Celtic." See Def. Ex. G; CDC-0009. The ban extends to dictionaries in these languages. Id. The ban was instituted in an effort to combat the use of foreign languages to communicate "coded messages" among prison-gangs. See Lujan Decl. Plaintiff presents a facial constitutional challenge to the ban alleging that it is overbroad in its censorship of non-English or Spanish materials that do not contain "coded messages," as well as a specific challenge to the denial of the dictionary, *Teach Yourself Swahili*.

#### a. **Policy Banning Publications and Correspondence Written in Swahili, Nahuatl, Runic or Celtic**

On December 28, 2001, all staff were advised by a memorandum from Warden Joe McGrath that publications and correspondence written in the languages of Swahili, Nahuatl, Runic, or Celtic were disallowed at PBSP. Def. Ex. G, CDC-0009. The prohibition extended to dictionaries written in these languages. The policy banning publications and correspondence written in Swahili, Nahuatl, Runic or Celtic is reasonably related to legitimate penological interests.

First, there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it. Turner, 482 U.S. at 89-90. In order to determine whether there is a rational connection between a prison regulation and the governmental interest put forward to justify it requires finding that: (1) the governmental interest is legitimate; (2) the governmental interest is neutral; and (3) the logical connection between the regulation and the interest is close enough to be rational and not arbitrary. Id. Maintaining institutional security is certainly a legitimate governmental interest. See Thornburgh, 490 U.S. at 415. Here, the policy is intended to maintain institutional security by limiting inmates' access to foreign language materials (including Swahili, Nahuatl, Runic

13

1 and Celtic languages) because prison-gang members have used these languages in the past to
2 communicate coded messages to conceal the planning and execution of criminal activity.
3 See Lujan Decl.; Def. Ex. C.

4 Although regulations restricting inmates' First Amendment rights must operate in a
5 neutral fashion, without regard to the content of the expression, regulations are considered
6 neutral for purposes of a Turner analysis if prison administrators draw distinctions between
7 publications solely on the basis of their potential implications for prison security.
8 Thornburgh, 490 U.S. at 415-16. Preventing the communication of coded messages is a
9 neutral governmental interest aimed at enhancing prison security and not at the suppression
10 of expression as claimed by plaintiff. Id.

11 Further, the connection between banning Swahili, Nahuatl, Runic and Celtic
12 languages and preventing the dissemination of coded messages is close enough to be logical.
13 Plaintiff's claims that English and Spanish are the primary languages used to disseminate
14 coded messages. He claims that because the policy does not ban English and Spanish
15 materials that it is discriminatory and unrelated to its stated purpose of preventing the
16 dissemination of coded messages. This claim is without merit. Plaintiff presents no evidence
17 that the majority of coded messages are written in English and Spanish. Further, one of the
18 reasons offered in support of the ban is that it would be "impossible [for prison officials] to
19 translate all documents at Pelican Bay that are written in Swahili, Nahuatl, Runic and Celtic."
20 See Lujan Decl. Prison officials do not face this challenge when monitoring communications
21 written in English or Spanish.

22 The second Turner factor – whether there are alternative means of exercising the right
23 that remain open to prison inmates – requires that the right in question be viewed sensibly
24 and expansively. See Thornburgh, 490 U.S. at 417. In this case the second Turner factor is
25 satisfied because the ban leaves open alternative means for prisoners to exercise their First
26 Amendment rights. Inmates still have access to a "broad range of publications." See
27 Thornburgh, 490 U.S. at 418; Stefanow v. McFadden, 103 F.3d 1466, 1474 (9th Cir. 1996)
28 (even though prisoner banned from reading particular publication, alternative means of

14

1 exercising First Amendment rights remain available where access to material which does not
2 violate prison security policy was unaffected).  Plaintiff claims that the ban on the Swahili
3 language interferes with his ability to communicate with certain family members, leaving no
4 alternative means for him to exercise this right.  However, plaintiff has offered no evidence
5 to support his claim that the ban has actually interfered with him communicating with family
6 members.  See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988) (conclusory allegations
7 insufficient to defeat summary judgment).

8       The third Turner factor – the impact of accommodating the asserted right--favors
9 upholding a regulation limiting access to certain publications if accommodating the asserted
10 right to receive the publications would threaten prison security and order.  See Thornburgh,
11 490 U.S. at 418.  Prison officials are given considerable deference when considering
12 regulations that are instituted to maintain prison security.  Id. at 408.  Here, prison officials
13 found that allowing prisoners to communicate in Swahili, Nahuatl, Runic, and Celtic had a
14 negative impact on prison safety and security.  See Lujan Decl.; Def. Ex. C.  Specifically,
15 prison officials found that prison gangs used these languages to communicate the planning of
16 criminal activities, including the use of Swahili to communicate coded communications in
17 planning and executing the murder of a correctional officer.  See Lujan Decl.  Plaintiff sets
18 forth no credible contradictory evidence.

19       Finally, the fourth Turner factor is met because plaintiff points to no alternative that
20 fully accommodates inmates' First Amendment rights at a de minimis cost to valid
21 penological interests.  Thornburgh, 490 U.S. at 418.  The burden is on the inmate challenging
22 the regulation to show alternatives to the regulation; plaintiff's conclusory assertion that the
23 regulation is an "exaggerated response" is insufficient to overcome the valid security
24 concerns motivating the policy.

25       The ban on materials written in Swahili, Nahuatl, Runic, and Celtic is rationally
26 related to the legitimate interest of maintaining the security and safety of PBSP.  Plaintiff's
27 facial constitutional challenge is without merit.

28

15

### b. *Teach Yourself Swahili*

The confiscation of the book *Teach Yourself Swahili* pursuant to the policy banning materials written in Swahili, Nahuatl, Runic, and Celtic satisfies the Turner test. First, there is a valid, rational connection between the application of the policy and the legitimate governmental interest of maintaining prison security. The denial of the book *Teach Yourself Swahili* was rationally connected to this interest because there is undisputed evidence that the Swahili language has been used to communicate in coded messages among prison gang members, and plaintiff is a validated member of a prison gang. See Lujan Decl.; Def. Ex. C. Further, the ban extends to all inmates. Id.

The second Turner factor is satisfied because plaintiff retains alternative means to exercise his First Amendment rights. As noted earlier in this order, plaintiff still has access to a "broad range of publications." See Thornburgh, 490 U.S. at 418.

The third Turner factor favors upholding the prison officials' actions because the impact of accommodating plaintiff's asserted right to receive the publications would threaten prison security and order. Id.

Finally, the fourth Turner factor is satisfied because plaintiff points to no alternative that fully accommodates his First Amendment rights at a de minimis cost to valid penological interests. Id. Contrary to plaintiff's assertions, there is no triable issue of fact as to whether the dictionary was properly denied. The ban specifically prohibits Swahili language dictionaries. It is not necessary for Swahili language material to actually contain coded messages to fall within the range of prohibited materials covered by the policy. The threat to institutional security is in the potential that the dictionary, *Teach Yourself Swahili*, will be used to write or translate coded messages intended to communicate the planning of criminal activities. The distribution of the book *Teach Yourself Swahili* to prison inmates risks institutional security.

The PBSP policy banning materials written in Swahili, Nahuatl, Runic, and Celtic is reasonably related to the legitimate penological interest of maintaining prison safety and security. Plaintiff presents no evidence to support his claims that either the policy or its

16

application are discriminatory and overbroad. Defendants are entitled to summary judgment. See Celotex Corp., 477 U.S. at 323.

### 4. Qualified Immunity

Defendants claim that they are entitled to qualified immunity for their decisions to deny the publications at issue. Under Saucier v. Katz, 533 U.S. 194 (2001), the court must undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment. The court first faces "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.

If the court determines that the conduct did violate a constitutional right, it then moves to the second step and asks "whether the right was clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02. Even if the violated right was clearly established, qualified immunity shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted. Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004); Saucier, 533 U.S. at 205-06. If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." Id. at 205.

The first step under Saucier here is to determine whether defendants' conduct violated plaintiff's constitutional rights either through the application of valid prison regulations, or by denying him the publications at issue, i.e., (1) Star Distribution catalog; (2) September and October 2003 issues of *Esquire* magazine; (3) *The Best American Erotica*; (4) *The Book*; and (5) *Teach Yourself Swahili*. But even if defendants' actions violated plaintiff's constitutional rights, defendants are entitled to qualified immunity because it would not have been clear to a reasonable official that such actions were unlawful under the specific circumstances of this case. See id. at 201-202.

### a. **Denial of Materials Depicting Frontal Nudity**

California Code of Regulations title 15, section 3006(c)(17)(A) provides that "[s]exually explicit material shall be defined as material that shows the frontal nudity of either gender, including the exposed female breast(s) and/or the genitalia of either gender." It would not have been clear to a reasonable official that denying plaintiff the publications the Star Distribution catalog and the September and October 2003 issues of *Esquire* magazine would have been unlawful where each publication depicted the exposed female breast as prohibited by the regulation. Def. Ex. A, D, and E. Defendants are entitled to qualified immunity.

### b. **Denial of Obscene Materials**

California Code of Regulations title 15, section 3006(c)(15)(C)(1) prohibits material that "[d]epicts, displays, or describes penetration of the vagina or anus, or contact between the mouth and genitals." It would not have been clear to a reasonable official that denying the plaintiff the publications *The Best American Erotica*, and *The Book* would have been unlawful where *The Best American Erotica* contains an explicit description of oral sex, and *The Book* contains detailed descriptions of the penetration of the vagina or anus, contact between the mouth and genitals, and acts of sexual bondage, as prohibited by the regulation. Def. Ex. B, F. Defendants are entitled to qualified immunity.

### c. **Denial of Publication Written in Swahili**

On December 28, 2001, all staff were advised by a memorandum from Warden Joe McGrath that publications and correspondence written in the languages of Swahili, Nahuatl, Runic, or Celtic were disallowed at PBSP because these languages were being used by inmates to communicate in coded messages. Def. Ex. G, CDC-0009. The prohibition extended to dictionaries written in these languages. Id. It would not have been clear to a reasonable official that denying the dictionary, *Teach Yourself Swahili* was unlawful where it was the type of publication specifically banned under the policy. Defendants are entitled to qualified immunity.

18

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (doc #29) is GRANTED.

The clerk shall enter judgment in favor of defendants, terminate all pending motions (see, e.g., doc #22) as moot, and close the file.

**IT IS SO ORDERED.**

Dated: March 2, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE